Thank you, Your Honor. Robert Mitchell on behalf of the appellant, United Farmers of Alberta, or UFA. I have 15 minutes, Your Honor. I'd like to reserve five minutes for rebuttal. Okay. I'll try and help you. Thank you. The briefs in this case address a number of issues, but I'd like to focus today on two key points. First, the pretrial and midtrial rulings on damages by the trial court effectively allowed the landlords to recover a windfall contrary to principles of Washington law. And second, the trial court erred in dismissing all claims brought against Sportsman's Warehouse, the architect of the MTA transaction that gave rise to this dispute. With respect to the landlords, the trial court erred in at least two respects. First, the trial court failed to recognize that in an action brought for breach of contract, which this case was, the non-breaching party recovers its expectation damages, the benefit of the bargain. And that means that it gets what it would have received had the contract not been breached. Even the case of a lease agreement? Exactly, Your Honor. If the lease agreement contains a term that is sued upon, which is the case here, the argument brought by the landlords was that the tenant was required to obtain their consent to engage in the master transaction agreement, and it failed to do so. That was the basis upon which the case was tried. It was the basis for the jury's verdict. Well, I guess the plaintiff's theory was that the transaction was structured in such a way to evade getting sign-offs from the landlords, leaving in place what looked to me to be an empty shell that then defaulted on the lease and there were no assets to pay. That's exactly right, Your Honor. So the issue in such a case is what would the landlords have received had the tenant who defaulted remained on the premises, and if they lost money? Are we on the set-off claim? Is that where we're going with this argument? My understanding was that the landlord made some tenant improvements. The space in both malls were empty for some period of time, and then they re-let to new tenants who paid more in monthly rent than wholesale had paid. That's correct, Your Honor. And then the landlord sued just for the unpaid rent during the period of time the space was vacant and for the cost of the improvements. That's exactly right, Your Honor. Okay. And so the trial court decided that notwithstanding clear and undisputed evidence throughout the time leading up to the trial, including on summary judgment, that the landlords never terminated the leases. Was this specific issue raised in front of the district court? Oh, it certainly was, Your Honor. The dispute about whether or not the court should have awarded damages for the benefit of the bargain was the basis for the argument on summary judgment. It was raised again in motions in limine before trial, and the trial court made a ruling mid-trial that excluded evidence of surplus rents for the period of time after the premises were released. The court, in essence, rewrote history to say that the landlords were suing on their own behalf because they were not seeking damages for the period of time that the damages would have been negative. This issue came up mid-trial, though, did it not? Because it looked to me like Judge Robart had called for letter briefs on the question. Of the question of surplus rents, that's correct, Your Honor. So getting back to Judge O'Scanlan's question, was that issue preserved in the pretrial order or did it arise in the middle of trial? It was preserved, Your Honor, when the trial court entered summary judgment on damages. And my client raised the issue not just of the propriety of looking at the property value before and after the breach, but also the offset of surplus rents. The trial court refused to reach that question because it said it was not properly before it. And the reason for that is... Let me come at the question in a different way. What's unequitable or unfair about allowing the landlords to recover the amount of lease that the prior tenant defaulted on and the cost of tenant improvements incurred in order to re-let the premises? Your Honor, so far as that goes, that's not inequitable. But if the landlord chooses to re-let on the tenant's account, which is what happened here because there was no termination of the leases... Well, but that's a legal conclusion, is it not, on the tenant's account? I mean, my question basically is one of sort of basic fairness and putting the landlord in the position that the landlord would otherwise have been in. And it seems to me that the landlord acted in a perfectly commercially reasonable fashion in re-letting the premises, although it had to make some improvements to the premises in order to get the tenants in that wanted the space. We're not arguing that... The court and the jury awarded the landlords their lost lease payments and the cost of the improvements. What's unfair about that result? What's unfair about it, Your Honor, is that the landlord is put to a choice under Washington law after a breach in lease payments. And that is to either terminate the lease and re-let for the landlord's own account or to sustain the lease and re-let, in essence, on the tenant's account. And that is what the latter is what happened here. Then the landlord decided after summary judgment that it would have to pay back some of the rent because it made a better deal for the new tenants than for the old ones and persuaded the trial court that it was proper to exclude evidence of the increase in value and of the surplus rents. But I didn't think that the landlords were seeking damages for any period of time after the premises were re-let. That was at trial, Your Honor. At summary judgment, they said that the measure of damages is the deficiency in rent throughout the term of the lease. Then they figured out that it was a negative deficiency. I mean, the problem I'm having with your argument, and maybe it's an unclean hands equitable issue, is that on the assumption that the jury found that your client acted wrongfully in the manner in which it structured this deal and awarded the damages that the landlord suffered as a result of it, it seems to me that the jury reached a pretty common-sense conclusion to an otherwise pretty complicated commercial transaction. The jury followed the instruction that it received in the court, and the evidence of surplus rent was not presented to the jury because it was excluded by the trial court. Under Washington law, if you don't terminate the lease, you have to credit the defaulting tenant for surplus rents just as you would hold it liable for a deficiency in rent. But the tenant didn't suffer, or excuse me, your client didn't suffer from anything that the landlords did after the space was let. Your Honor, the landlords received the windfall because they received not only the amounts that would have been paid through the time that they re-let in every dollar of re-tenanting expenses, including, we believe, improperly calculated ones. But the jury decided that issue, did it not, in accepting the reasonableness of the amounts that the landlords claimed for the improvements? It did, Your Honor. The jury received no evidence of the surplus rents, which is the question that the trial court improperly- You're going round and round on this issue, but I'm really having a hard time understanding what's unfair to UFA when the landlords weren't seeking damages in the form of unpaid lease payments for the full term of the original lease when the claim stopped at the point at which the new tenants occupied the premises and started paying rent. Well, Your Honor, if there had been a deficiency in the lease payments under the new leaseholds, there's no question they would have sought that. It's the fact that they would have had to pay back a certain portion of the benefit that they got from re-letting that caused them to make a tactical decision. It just seems to me, Mr. Mitchell, that if anybody is looking for a windfall here, it's UFA. On the contrary, Your Honor. Because the landlords held these leases to not have been terminated, they were required to receive the benefit of their bargain, not more than the benefit of their bargain. And that was the error of law that the trial court committed. I'd like to turn to Sportsman's, if I might, Your Honor. Before you leave that, what does Hargis, the Hargis case, tell us? Hargis actually states the principle that was first enunciated in the peg versus petroleum products case, which is the landlord is put to an election about whether to terminate the lease or to re-let for the tenant's own purposes. And Hargis was a case in which the court said that if you terminate the lease, then the landlord doesn't have to account for gains. Peg was the converse of that. And the trial court erred in misapplying Hargis to these facts in circumstances where there was clear evidence that the leases were never terminated. Well, wouldn't the evidence that the lease were terminated, leases were terminated, be that the landlord isn't seeking damages for any period of time after the space was re-let? No, Your Honor. The decision about whether you're going to terminate the lease or not is made ex ante. It's in the communications that were made by the landlord to the tenant. Does Hargis say that the landlord can't change its election once it makes it? I didn't read the case that way. It doesn't say whether it can or cannot change, Your Honor. What it says is that if you choose A, then certain things follow, and if you choose B, certain other things follow. And what the landlords did here is a heads-I-win-tails-you-lose kind of choice by electing not to pursue damages during a time when the damages would have been negative, would have offset the damages they would otherwise have recovered. They got more than the benefit of their bargain is the point. Well, they got more in rent from the second set of tenants because obviously market conditions had changed and they were able to charge more rent. But I'm still having a difficult time understanding why it's unfair when the landlords weren't seeking any lost lease payments for that same period of time. I think we'd have a very different situation if the landlords were saying they're liable for the lease payments for the entire term of the lease, and just because we were able to find new tenants to occupy the space, we get to keep both what the new tenants paid us and damages from the old tenants for the unpaid term of the lease. I think that would be a very different situation than what we're facing. Your Honor, if the landlords choose not to terminate the lease, which is the case here, they get the benefit of the bargain for the entire lease term. The fact that the damages turn negative at one point doesn't change the rule. You don't get to make a tactical decision about whether you're going to seek damages for the entire term or not based upon— Was this issue addressed at all in the pretrial order? I don't know about the pretrial order. It certainly was in the summary judgment briefing and then at the mid-trial. Isn't the rule that once the pretrial order is signed that all of the pleadings prior to that time fall out of the case and then the case goes to trial on the allegations in the pretrial order? Well, Your Honor, we believe that the trial court erred in granting summary judgment on the measure of damages. That's what took it out. Those rulings would have occurred prior to the entry of the pretrial order, would they not? In the ordinary course, they would have. So I guess my question remains, can you tell me, was there any listing of this issue in the pretrial order? It sounds to me like there was not, but I'm not sure you all included the pretrial order in the excerpts of record. The pretrial order is not part of the excerpts of record. What is in the excerpts of record are the motions in limine and the motion on summary judgment, which is where the error occurred, and we have appealed those properly. With respect to sportsmen, the trial court erred in granting summary judgment on the landlord's tortious interference claim. The evidence in the summary judgment record showed both improper purpose and improper means. The evidence is summarized at the third supplemental excerpts of record, pages 99 to 101. Counsel, I guess the same concern about whether this argument has been waived as well, did you oppose sportsmen's motion for summary judgment? No, Your Honor, the landlords opposed it. Did you object to the trial court's grant of summary judgment? Not contemporaneously, Your Honor. Well, isn't that a waiver? No, Your Honor. Under this court's precedent in the Switlik-Parachute case, a party that is aggrieved by the grant of a summary judgment to a co-defendant has standing to pursue the appeal if there is adverse consequences to the co-defendant and it's aggrieved in the sense of either collateral estoppel consequences or being left holding the bag, both of which are true here. Mr. Mitchell, on the facts of this case, I'm having a really difficult time. If anybody got left holding the bag, it was the landlords, based on this deal to transfer all but the shell of wholesale sports, which was the signator on the original lease, leaving it completely judgment-proof as far as the landlords were concerned, vis-à-vis the tenant. I would grant you, Your Honor, that that's a fair characterization of the circumstances as they existed at the time that the leases were breached. The deal was brilliantly structured. I will give the lawyers credit. It's got some of the best lawyers in the country writing the terms of this complicated transaction, but at the end of the day, the landlords got the shaft. That's how I think the jury saw it. I believe that you're right, Your Honor. My point is that after the jury rendered its verdict and held sportsmen responsible for the consequences just as my client was held responsible, the judge overturned the jury's verdict by granting judgment as a matter of law, and we believe that it erred in doing so. It erred because not only was there factual dispute for the jury to consider on where the money went, the more important factor is that these steps in this transaction have to be considered together. Substance matters more than form. With respect to the money, my numbers indicate that $1.18 million in closing funds went to UFA, I guess, and then $589,000 in closing funds went to GOB for a total of $1.8 million. Now, how were those funds used? Were any of those available to pay rentals? Judge O'Scanlan, I'd just like to correct one point. $1.18 million came from my client, UFA, and went to Alamo slash GOB and about $500,000 from sportsmen's. That was money that would lead to the closing of the transaction after GOB balked. The funds were calculated, the amount of funds were calculated based upon upcoming lease payments, and it was my client's understanding that they would be so used. Sportsmen's and GOB concluded that there would be no restrictions on the use of the funds, and they were, in fact, used to buy sportsmen's inventory in other stores. Can I ask you a quick question? If we were to reinstate the jury's verdict against sportsmen's on the UFTA claim, does that render irrelevant the district court's ruling on the tortious interference claim from your client's standpoint? Your Honor, what the trial court did is grant, in the alternative, a motion for new trial. So I don't know that it lies within the power of this court to reinstate the jury's verdict without remanding for trial. And if the case is remanded for trial, the issues properly before the new jury would be tortious interference as well as the fraudulent transfer act. I'd like to save my time, so let me wrap up this portion of my argument by saying that we are asking the court to reverse the trial court's orders granting summary judgment to the landlords on the measure of damages and granting summary judgment to sportsmen's on tortious interference. We ask also for reversal of the trial court's grant of judgment as a matter of law to sportsmen's on UFTA. Correcting these errors of law is both necessary and appropriate to address the windfall the landlords received and to ensure that the architect of this transaction, sportsmen's, does not escape responsibility. Thank you. Okay. Thank you, Mr. Mitchell. Whatever you're writing, Mr. Pearson. May it please the court. Matthew Pearce for Appellee Cross Appellant Lacey Marketplace. I'll be taking 15 minutes, and Mr. Kinley, who represents Burlington, will save five minutes for rebuttal. Okay. We start from the basis, as Your Honors recognize, that UFA has admitted liability for tortious interference and for UFTA. That's the baseline where we start. And as they cited in the brief, we need to avoid the temptation to label everything legal and usurp the province of the fact finder. It's at page 35 of UFA's opening brief. Let's not lose sight of what happened here. It was a very simple dynamic. It's an unbroken sequence of causation for the tortious interference. Wholesale had been paying rent. Wholesale gets cleaned out. It's stock sold to UFA. Wholesale quits paying rent. Landlords need to find new tenants. The new tenants require tenant improvements. They pay for the tenant improvements to secure the tenants. The judgment here can be affirmed solely on the tortious interference claim. There's no judgment for breach of contract against UFA. It's for tortious interference. There's separate instructions on that. The damage against UFA fits squarely within jury instruction number 25, which is at supplemental excerpts record 163. And it reads, tortious interference or damage is approximately caused by the tort defeasor's conduct. And per the instruction, there's no duty to minimize losses incurred due to tortious breach of interference. And that instruction doesn't exclude that sentence, minimizing losses, doesn't exclude breach of contract damages and the duty to minimize there. They didn't object to the instruction. They didn't suggest additional language that would clarify anything they wanted to clarify with regard to that instruction. So that alone is justification enough to affirm. Addressing UFA's contract arguments that they put in the briefing and they mentioned this morning, the prime focus is a set-off for future rents and a market value set-off. Is this a surplus rent argument? Yes, Your Honor. Surplus rent argument and a market value, property value argument. Those are the set-offs that they argue. They all depend on, according to UFA, whether the lease was terminated. What we have here is a situation where, if you look at the Hargis case, and I can read it at page 81, so 730p2 at 81, it says, MedMAL would be entitled to a set-off for the excess rent if it had treated the lease as continuing. And it goes down below. However, that rule is inapplicable where the lease is treated as surrendered or forfeited. Hargis was not awarded damages based on rental values from September 1984 onward, as obviously it suffered no loss after that. Rather, it recovered damages based on the payments not made by MedMAL, the tenant, for the 14-month period until the forfeiture. That's what we have here in this case as well. So your position is that you all did terminate? Yes. And when did that happen then? Here's the situation. What we did is we treated the lease as surrendered and forfeited. And that is from the beginning, Your Honor. Unlike what Mr. Mitchell said, if you look at the record, and it begins with a declaration of Rob Andrews, who is from Lacey Marketplace. This is at ER 729. It's dated June 11, 2013. It was Mr. Andrews' declaration in support of the motion for default. And this is two years before trial, and it is seven months before we add an UFTA claim against both UFA and sportsmen. And what Mr. Andrews says is Lacey's damages are the amount of rent due under the lease for the 18-month period between the date of reentry and the date a new tenant begins operating in the space and paying rent, along with other damages. So it's been consistent throughout the litigation, Your Honor. Okay. So this is during the litigation. But right after – well, I'm just remembering the letters that you guys wrote that said, we are not – just to be clear, the leases are not terminated. So that's before this thing that you just referred us to? No, Your Honor. June 11th is – I don't have the exact date, but it's within the same week, week or two of those letters. And Judge Robart, in his order on summary judgment, found that he had looked at those letters and he had looked at the case and felt that it could move forward because the tenants were relighting on their own account. And he had used that based on the fact that we weren't seeking future rents and we had been consistent throughout the litigation, both with Mr. Andrews' declaration at that point a year and a half prior. Our experts' declaration, Lorraine Barrick, also capped the rents at the time that the new tenant comes in and starts paying, and even in our closing. So this wasn't an ad hoc after-the-fact situation. This was the position we had taken throughout. The references that Mr. Mitchell makes to agreement on standard of damages was related to the summary judgment motion, which was specific to the market value deduction, not a surplus rent issue at that point. None of this is in the pretrial order. Well, maybe you can help me with this. I'm looking at ER 457, which is the Burlington letter to Wholesale Sports when Burlington learned about the proposed transaction. And Mr. DuBose, Mac DuBose, says in the last paragraph of the letter, if the transaction does somehow proceed, sportsmen and its predecessors will not be released from liability under the lease. I mean, that looks to me like the landlord is taking the position that the lease is not terminated. We're going to look to you for our remedies under the lease, which would include liability for the entire term. Two things. One, Your Honor, in the Hargis case, the landlord sent a very similar letter, but the damages that they sought were consistent with a lease being terminated. The court said they're treating the lease as forfeited or surrendered. The damages show that, and it's inapplicable. That rule is inapplicable where the lease is treated that way. Two. So is your position that the election is not irrevocable in the sense that, even if I were to read this letter as a statement of the legal position that we will take if you are in breach of the lease, that by the time you get to trial, the landlord can elect not to enforce the full provisions of the lease and look just to the unpaid lease up until the point that it released the premises? Hargis allows the landlord to make an election. Hargis also says you need to look at the conduct of the parties. And the conduct of the parties here consistently, within the same week that these letters were sent, which Judge Rohrbart found as the landlords relating on their own account, it was consistent with the damages sought were consistent with a lease being terminated. Counsel, the district court found that UFA waived this argument. Are you pursuing that issue here? I think the argument has been waived, Your Honor, and the reason it's been waived. Well, you've gotten to the merits, obviously, in your presentation here, but are you waiving your waiver argument? No, Your Honor. We're not waiving any waiver argument. As the court aptly noted, none of this appeared in the pretrial order. Two, the summary judgment motion that UFA stands on with regard to the surplus rents issue didn't address that. What that addressed was the market value deduction, and that was specific to what the experts were testifying as to. And that was revisited at trial as well. And Judge Rohrbart found that they had not provided adequate details in their expert report as to market value, and he wouldn't let them testify. And the basis of UFA's argument with relation to termination also implicates the speculative nature of rents Then you're right. Future rents are speculative, but we didn't pursue future rents. We didn't pursue them. Counsel, would you get to the JMOL issue? Yes, Your Honor. I assume that's your argument. It could be killed counsel, but just as long as we can. I can address some of it, Your Honor. When you say JMOL issue, there's a few of them there. We've covered the surplus rents with regard to JMOL. Do you have a specific question? The question is whether the court erred in granting JMOL to sportsmen on the UFTA claim. Oh, to sportsmen. I can move on to sportsmen, Your Honor. Maybe you could start. Do you all care about that at this point? We do. There's a couple of reasons. And I know sportsmen raised this, said, well, why do you care? You've got a bond. Well, the bond's about to expire, and we have a Canadian corporation. And so interest is going to stop. And to the extent we want additional monies, we're going to have to go to Canada to get those. I know there was a question from the court whether the court could affirm the judgment for UFA on the tortious interference and on other grounds, under Del Monte or others, find that we're in reverse sportsmen's JMOL and find them liable on UFTA and UFA liable on tortious interference. And I find nothing in the case law that was briefed that prevents the court from doing that. What do we do, though, about the grant of a new trial? That is a tricky little issue. The conditional grant. Yeah, conditional grant. We're here today, Your Honor, to I think you can affirm with regard to UFA, regardless of how you want to do it, whether it's tortious interference or UFTA, the scale of the damages are slightly different. The elements are different. They're not the same claims. With regard to sportsmen's, I guess Your Honors are asking if you reverse the JMOL, what's left to remand to the courts? Well, no, there would be a new trial. There's a conditional grant of a new trial. A conditional grant of a new trial. The question is whether we as an appellate court have the authority to tell the district court, your conditional grant is hereby vacated as well. I'm not sure we can do that. Well, Your Honor, we didn't address that in our briefing. I'd be happy to do some supplemental briefing and get it to you. We'll talk, and we'll decide whether or not we need some more briefing on that. But it is a tricky little question. It is, Your Honor. And to address the sportsmen's, because I know Your Honor asked. But it turns on the question of whether the jury had only one potential decision it could make or whether there were several interpretations of the facts that were appropriate. That's a very good question, Your Honor. And two things to remember with regard to the summary judgment order, which is in the record. Judge Robart found that there were issues of fact that could be sent to the jury on UFTA, both for UFA and for sportsmen's. And in the order on motion for entry of judgment at ER 160, he also recognized the factual dispute. And at trial, we presented first on the constructive fraud claim, both evidence that wholesale didn't receive reasonably equivalent value in document form, the funds flow schedule, along with testimony, which was from Mr. Melnicek, which was a 30B6 corporate witness. And his quote during his testimony, and this is at ER 1718 and at supplemental excerpts of Record 41. And I'm leaving out the first part, but the final sentence is, the funds didn't go through Wholesale Sports U.S. Those funds went to UFA because UFA was the one that was selling the business. And he took the stand as an individual witness, and we used this language with Mr. Vuke, one of his employees, and read it to him. He disagreed with it. Was that the one where Goot said, well, he's not as close to the money as I am? Right. So basically he doesn't know what he's talking about. Well, speaking of deciding things sort of after the fact, that could be one of them because it's not something you mentioned earlier in the case. But what we had was we had factual evidence, both in document form, the funds flow, that specifically said UFA, United Farmers of Alberta account, with the same in-account number, and it had a reference. UFA owned Wholesale Sports was a wholly owned subsidiary, was it not, of UFA? Your Honor, yes, but I'm not sure if that. Well, I guess the question I'm asking, and I don't know the answer to this, is if UFA maintained some sort of a bank account in its name into which profits from Wholesale Sports were deposited as a wholly owned subsidiary, so what? If they were really the so what, Your Honor, then they wouldn't have to transfer them. These deposits went into a bank. But UFA needed the proceeds to pay off its debt that it had incurred when it bought or established Wholesale Sports, didn't it? It matters. I mean, was it like $16 million or something? It was about $16 million, but it matters for purposes of the Uniform Fraudulent Transfer Act where that money went because if it never was in a wholesale account. But your theory is the whole thing was just a pass-through, right? I think first the theory was that they didn't even bother with the pass-through because they sent the money directly to UFA. Second, it's a pass-through under the MTA as it was structured, and everybody knew that. Right. And so that's the issue with regard to the constructive fraud. But there's also the actual intent, the actual fraud claim as well, that we believe the court erred in granting the JMLL. That's the part of the Uniform Fraudulent Transfer Act that has 11 badges that you look at. The court found that we satisfied three of those badges and then said, oh, well, but these others aren't as important. But they actually are. And what it was was the standard is an actual intent to hinder, delay, or defraud. Hinder is not as strong as defraud. The relevant question was intent. The three they said we established, which we've talked about here, is that wholesale became insolvent shortly after, the transfer was all of wholesale's assets, and the transfer occurred shortly after a substantial debt. Well, if we agree with you on JMLL, it goes back for a new trial. And what's going to happen in the new trial? What will the issues be? Because the decision to grant a new trial has already been made, has it not? I guess I don't understand, Your Honor. The clock has stopped. Oh. I mean, the argument is so good that time stands still. It just started going. I do want to save time for Mr. Kinley. I'm over my. Well, you're over your five-minute. I'm over it. Yeah. Go ahead and answer Judge O'Scanlon's question. You are asking us to reverse the finding of JMLL. Do I understand that? Did I hear you correctly? You heard me correctly, Your Honor. All right. What happens as a result? If we do that, what happens? Well, Your Honor, we would request you reverse Justice Sportsman's and leave the tortious interference claim against UFA intact. And that's what we mentioned earlier about supplemental briefing, even if Your Honors would like, because I recognize your concerns. Okay. Okay? Thank you. Thank you. Yeah, I think we need to flesh that out a little bit. May it please the Court, John Nelson on behalf of Sportsman's. I'd like to address the Court's questions to opposing counsel, if I could very briefly. Judge O'Scanlon, you asked counsel for UFA whether they waived the tortious interference argument by not opposing it at trial court. They did. The record is clearer that UFA could have opposed Sportsman's motion for summary judgment. They did not. They did not object to the order granting summary judgment afterwards. But there's more than that, because not only did they not oppose it, in this case UFA took the exact opposite position from that which they are advocating now. Now they're saying, well, it's tortious interference because they exercised improper means by participating in a fraudulent transfer. We have cited in our brief, and the record is clear, at the third supplemental excerpts of record 078, UFA's trial brief argued point blank, this was an exchange of reasonable equivalent value among all participants, whether by way of an asset sale, stock sale, or combination of both. Because wholesale received reasonable equivalent value, the landlord's fraudulent transfer claim should fail. They also argued in closing to the jury that wholesale received reasonable equivalent value from Sportsman's. They're not just, not only did they waive the argument, they're now trying to advance an exact opposite argument in appeal, and they shouldn't be allowed to do that. With respect to the question of whether the issue was presented to Judge Robarts regarding JMOL, Judge O'Scanlan, you also asked would this, please address the JMOL. And my question to try and answer the court's question is, which argument is the court concerned about? The case was tried with respect to Sportsman's. Maybe I'm confused. Are there more than one JMOL issues here? No, just more than one argument. Okay. There was the argument that was raised before the trial court, and that argument focused on the only issue ever tried by Judge Robart. It was the only issue of fact that the court identified precluding summary judgment for our motion for summary judgment on the fraudulent transfer. And the judge said, well, there's an issue whether Sportsman's paid wholesale directly or paid UFA, we're going to try that. And that was the issue that we tried. That was the issue that was presented to the district court in which it decided JMOL. Well, wait a minute. You say we tried that. You mean it went to the jury? Correct. Okay. And the jury found? The jury found Sportsman's liable for fraudulent transfer. Okay. And then the district court? Set it aside. So let me see if I can apologize if this is breaking up your argument. But are you saying then that the jury saw this thing as one unified transaction, therefore it rendered the judgment that it rendered, the verdict that it rendered, but the court tried to break it into two separate transactions? No, Your Honor. The court had held that it needs to be evaluated as two separate transactions. And, in fact, the jury instruction said you should evaluate each transfer separately. So there are questions of fact to be resolved is what you're saying. But in closing, the landlord's lawyer made the beneficiary argument, said, look, we know the money went there, but you can hold the beneficiary liable. And that's when I interjected and asked the judge, that's not the case we've been trying. And he addresses that in his JMOL. And, in fact, part of the reason he grants a new trial is because he determines that the jury instructions did not adequately instruct the jury as to that issue, the beneficiary issue, which was raised in kind of a sneak attack. But that was the only issue. The JMOL should be affirmed because what the landlords argue is, well, there is evidence that the jury could believe that would indicate that sportsman's paid UFA directly. That is the snippet of deposition testimony that was not presented to the witness. And, frankly, it's fairly convoluted. My co-counsel or opposing counsel read one line. But if you read the testimony at all, it's all over the place. And then there was a single document that labeled an account as United Farmers. That was the dash 6106. But then the reference is Wholesale Sports of America. And what the judge said is, look, the evidence at trial included Mr. Melnichuk's testimony under rigorous cross-examination for 10 minutes saying, no, it went to wholesale. And Mr. Vuk doing the same, I know this stuff, and it went to wholesale. There's no question 6106 was a Wholesale USA account. And the record evidence, contemporaneous documents from UFA, this is in the record at SS, the second supplemental excerpts of record 298 through 300. Those are UFA's contemporaneous documents that identify the wholesale accounts and identify 6106 as a wholesale account. And what the court says is the standard here is what could a reasonable jury conclude, not what. Sometimes snippets make a difference. I understand that, Your Honor. Your Honor, all I can say is that the trial court was confronted with this evidence and with this precise argument. What you're saying is that the jury could only have made one conclusion given the record presented to, or given the presentation made to it. What the court held and what we believe should be affirmed is that a reasonable jury could reach only one decision.  He was there at trial. He looked at all of the evidence. He addressed the fact that the landlords didn't confront Mr. Melnicek with his own testimony. They came in through another witness. I mean, it was a strategic decision, and it was clever. But the judge said, no, a reasonable jury, this is a binary issue. It's one or the other. That's the issue we tried. That should be affirmed. Now, I addressed the other JMLL argument, and that is the new JMLL argument that UFA raises, the collapsing doctrine. And the collapsing doctrine argument should be rejected for both substantive and procedural grounds. Judge Tallman, you mentioned kind of basic fairness and whether UFA is looking for a windfall. And I think the issue that needs to be highlighted here is the fact that, and HBE is a very good case for us. It relies, UFA relies on it. But the collapsing doctrine is clearly an equitable tool, okay? The Orr case makes that clear, as do others. So you look at equity. What UFA is, if there was any aspect of the MTA that was fraudulent, it was the $16 million in net cash proceeds that UFA took for itself to pay its own debt. Because the $30 million, remember, the inventory was valued at 37. Sportsmen paid 47. $30 million went to pay off wholesale's debt. And then UFA pocketed the extra 16. UFA is now, so if there's anything fraudulent, it was UFA's conduct. What UFA is now saying is we'll apply an equitable doctrine to make a party, a third party, not an insider, pay again because we pocketed the money. And there's no victim here because UFA is solvent and in court and has admitted liability. And that would be an aberrant application of the collapsing document to make an innocent or a third party. I said innocent. I just want to point out. At trial and in the briefing, there's a lot of discussion of the fact that sportsmen knew that the money was going to be transferred to UFA. And that sportsmen knew that it was likely going to leave wholesale without assets. What the record does not explain, there is not a shred of evidence to suggest that sportsmen knew anything about wholesale's affairs or the amount of its debt or that $16 million would ultimately be pocketed by UFA. That's the aspect that's wrongful. And HBE makes clear that the innocent transferee has to have knowledge of the facts that make the scheme fraudulent. The mere fact that a debtor may be left without assets doesn't make it wrongful if the debt or if the proceeds, the sale proceeds, are applied to pay legitimate debt. In essence, there is an argument by UFA. Well, you should penalize sportsmen because they didn't police us to make sure that we weren't ripping off the landlords. And that's not an apt application of the collapsing doctrine. And finally, I just want to say, because we've heard it twice in the argument, the assertion is that sportsmen structured the transaction. And that assertion is just factually false, and it's contrary to the record evidence. Mr. Melnicek, UFA's president, said, well, our lawyers were involved, and UFA had capital partners representing it. And at the second supplemental excerpts of record 180 through 195, we've included the evidence that the initial LOI, the letter of intent, came from capital to Gabi. They sent them capital. That is, UFA's representative sent Mr. Gabi a letter of intent and said, here's the letter of intent we want you to send us. And then that formed the basis for the transaction. It also includes the emails from Mr. Gabi and Mr. Eastland, where Mr. Eastland is saying, well, which way do you want to go? How do you want to structure this? Stock or stock or just asset and stock? And Gabi says asset and stock, we're assuming $17 million in rent liability. So to suggest that there was testimony that sportsman's lawyers, O'Melveny, Myers, held the pen. Mr. Eastland said, yeah, I mean, our name's on it. It doesn't mean they were giving the dictation. Okay. Thank you very much. Thank you, Your Honor. Kathy put five minutes on the clock. May it please the Court, Roger Kinley representing Burlington Retail. I want to respond to some of the points. The first point Judge O'Scanlan raised about whether this was preserved, the issue of the surplus rent and the termination claim was preserved at the district court. We refer the court to our brief, pages 18, 19, and 20, that, quote, because it was so well stated and worded by Judge Robart, we quote Judge Robart there as pointing out that the issue of whether there was termination was never raised at any time. And, in fact, he goes into great detail about that in his quote, which is in the order denying UFA's motion for judgment as a matter of law. So it wasn't included in the pretrial order. It was not. And that's why when it came up in the middle of trial, he called for supplemental letter briefs from both sides. That's correct. I was there. Mr. Pierce was there. Mr. Nelson was there. We have different counsel on appeal. So, in fairness to UFA, they have new counsel on appeal. But for those of us there, we vividly remember how it came up and what came up. In the briefing in this court, what new counsel for UFA has done is to conflate the argument between whether the excess rent, that is the rent for the period of time after the new tenants came in and after the landlord's released, they have conflated that issue with whether the lease was terminated. Going back to Judge Watford's question, was it terminated, the letter that you mentioned, Judge Tallman, was right before, it was actually before the lawsuit was filed. It was before the MTA was closed. It was before all these guys got together and disturbed the 47 men. The landlord was basically saying, hey, wait a second, you guys, you can't do this without our consent. Correct. And when you, I guess I step back and I think about this from a pragmatic standpoint. When you ask a layperson, hey, is the lease terminated, and the layperson says, you know, we're going to make sure that we're holding you liable for everything, and I think you have the right under the Hargis case to decide, Hargis talks about three things, and this is what UFA also conflates, and they ignore two out of the three. Hargis said, and Mr. Pierce read it, but I will also read the same thing. Hargis says the rule is inapplicable, that is the rule that you have to offset the future rents, where it's treated as surrendered or forfeited or terminated. So if you have, the tenant has abandoned, as here, both tenants abandoned, wholesale abandoned, both locations. Landlords go in, they take it back to re-let. They can say, we've surrendered or forfeited the lease under those circumstances. The termination language is seized upon by UFA, and they want to read this as termination and then go back to testimony where the lay witness is asked, did you terminate? I didn't terminate because we're in there re-letting for the purposes of mitigating our damages. So we believe under Hargis, to the extent that you look at contract damages in a situation like this, under Hargis, the court found the exact right result with UFA, and that's what the jury was instructed, and that's what it was found. And again, going back to the quote of Judge Robart that we have in our brief, he analyzes this very carefully and very clearly. So back, following up on your question, Judge O'Scanlan, while the question of surplus rent or excess rent was addressed, the question of was it terminated was not, and that was first raised, and we are not waiving that position on this appeal, that that was not raised at trial and was therefore waived by UFA. I also want to talk quickly about this windfall question. As we have in our brief, and it's uncontroverted, one of the things Hargis says, Hargis talks about three reasons why you don't give the benefit of the future. One is because the tenant already gets the benefit of being released of future liability by that. The second reason is speculative damages to go into the future. And the third reason under Hargis, as they say here, is that it is unfair to the landlord to have to pay out-of-pocket expenses while waiting for new rent, which is exactly what went on here. It was $200,000 per month per locations that the landlords were paying while this was going on. We're almost five years away. We're getting interest on this judgment at .0025 with a bond that's about to expire. It's unfair to the landlords, and it's unfair to go forward with that in terms of under the Hargis analysis, especially where the replacement tenant has already filed bankruptcy. No rent has been received from the replacement tenant, so to the extent there's talk about windfall, which we dispute anyway, there is no windfall because the replacement tenant has gone bankrupt, just like Sportsman's Warehouse went bankrupt originally, putting UFA in. UFA then has wholesale sports go bankrupt. So back here we are again, second verse, same as the first. Let me talk quickly about one point that Mr. Nelson raised. He quoted some of the – he said, we didn't know what was going on, that is, Sportsman's did not know what was going on with regard to wholesale. And yet he quoted at the end an email that he put in his brief in which Mr. Gobby was involved in this and who also got paid that extra money at closing in order to go forward with his transaction. Gobby says, we're assuming $30 million in liabilities. There's no question Sportsman knew exactly what was going on. What Judge Robart did was to say, even though when Judge Robart issued his order on May 21st of 2015 and denied the motion by Sportsman's on the order on entry of judgment, Judge Robart found at ER 160 there are all these disputed questions of fact, all these issues that the jury had to decide. As you said, a snippet may be very important. The jury heard all this. We have the right categorically under Federal Rule of Civil Procedure 32 to use the deposition of a party any way we want. We chose to use it that way. Whether that's tactical or not doesn't matter. The jury could decide all of this. In this order, Judge Robart looked at all that, denied Sportsman's motion at that point, but then later decides that he's going to substitute his decision for that of the jury, which we think is improper. Let me address quickly the last point and, of course, any questions the Court has. The question about what about it going back? Do we care if we get the judgment against UFA? I think our clients, both landlords, only want to be paid what they've been owed for now almost five years. If we get paid that, our clients, they've got paid what they deserve and what they're owed, and that's that. That's fine. The problem we have is that the bond is about to expire. The additional interest was paid because of the delay in getting to this oral argument. Additional interest was paid by UFA, but they refused to pay any beyond December 31st. So in another 26 days, that interest, minuscule as it is at .0025, will expire, and then any amounts that were owed in addition we would have to go to Canada to collect. That's why we care about Sportsman's, and that's why we think it should be in. With regard to Judge Robart's decision to also order a new trial, I think this Court has the authority. It's the Court of Appeals of the Ninth Circuit. Nobody challenged the granting of the new trial as I read the briefs, so I don't see how we could possibly. It's already an impossible standard to do that anyway, but none of you all have challenged the conditional grant of a new trial, so I don't think that's on the table for us. Okay. I mean, I'm not sure why you all didn't, but I just looked at the briefs because I overlooked the new trial thing, and nobody has challenged that. I think on the brief, and that's correct, Judge Watford, but we raised the issue as appealing the order of Judge Robart, and we didn't parse that out, but I would think that's before the Court. But, okay, I understand that it wasn't briefed, and I understand we didn't spend a lot of time on that, so I understand that point. Let me address prejudgment interest. I do think Judge Robart made a mistake there. He found that it was a some certain, no question about that. Under Washington law, the prior case, as well as the Weyerhaeuser case, under Washington law prejudgment interest is appropriate if it's a some certain, even if there is a dispute as to some or all of the payment. Judge Robart analyzed this with regard to whether the amounts the landlords had to pay were for construction or for capital improvements versus tenant expenses. And Judge Robart, in looking at that contract analysis, said, well, the jury might have decided, had to make a decision whether these were appropriate in this bucket or that bucket, and they clearly found for the landlords with regard to that. But because there was an issue about that liability, then, therefore, I'll deny prejudgment interest, even though it's a some certain. Interestingly, UFA. But it wasn't a some certain if there was a challenge to the reasonableness of the tenant improvement. Judge Tallman, it wasn't a challenge to the reasonableness. There is no evidence in the record, nor at trial. I tried. There's no evidence at trial or. Nobody challenged the amounts that were expended. That's correct. But the jury instructions explicitly asked the jury to make a reasonableness determination, both on the amount of the rent for the time that the premises were vacant and for these improvements that you're talking about. It does, Judge Wadford. And the only part, so that I'm abundantly clear, the only part we're talking about here is on the construction improvements. That's all we're asking about, the prejudgment interest on that piece. But that piece, too, the jury was instructed, you have to make a reasonableness determination to figure out which box it goes in. And it seems to me that's. Under tortious interference, remember, UFA has admitted to being a tortfeasor. They've admitted to tortious interference, and they have admitted in this court to the Uniform Fraudulent Transfer Act liability. There's no contract claim against UFA, and none of this should be analyzed on contract with UFA. Under tort law, when you have a proximate cause, and these are the damages that occurred, the jury has to decide if these damages are appropriate. But that's what Pryor says. It's not a question of liability. It's a question of is it a sum certain, and we think it was here, and prejudgment interest should have been awarded. Okay. Thank you very much, Mr. Kinley. Thank you. I think, Mr. Mitchell, I think you have just a little bit of time left for rebuttal. Thank you, Your Honor. I'll be brief. First, counsel for Lacey quoted to you from excerpt of Record 729 about whether or not the leases were terminated. I will quote from you from excerpt of Record 728, the same declaration in which Mr. Andrews said, pursuant to the terms of the lease, Lacey Marketplace has, without terminating the lease, begun the process to reenter the premises and relet the space to another tenant. The landlords took the position consistently until they got to trial that the leases were never terminated. As to whether that issue was properly raised and preserved, page 10 of our reply brief sets forth all of the excerpts of record showing that we raised it three different times and the trial court rejected our position each time. With respect to our potential opposition to Sportsman's motion for summary judgment, the MTA itself set up an alternative dispute resolution process between the parties to it that precluded cross-claims between UFA and Sportsman's. The issues that we raise here and that under Switlik we are entitled to raise are the same issues that were presented to the trial court on the landlord's opposition. With respect to Sportsman's, as Judge Scanlon said, snippets of testimony matter, and it's clear from the jury's verdict that the jury saw substance over form as a guiding principle here. This court should as well, especially where the trial court not once but twice rejected explicitly Sportsman's claim of good faith. The idea that the transaction should be split between sale of the assets to Sportsman's and sale of stock to Gabi was not our idea, not UFA's idea. It came up after the letter of intent was done, and it was done by Gabi and by Sportsman's. Sportsman's told Gabi that once the stores went dark, they would have more leverage with the landlords. Sportsman's knew exactly what was going on. They were trying to assist the new owners of the wholesale to avoid their obligations, not just to these lessors but to others as well. With respect to whose responsibility the transaction was, if you look at the master transaction agreement, Sportsman's logo adorns the cover. The codes and the name of O'Malvin E. Myers, Sportsman's attorneys, appear on the footer of every page. This was Sportsman's deal. Burlington's counsel told you that it's not too bad that they didn't consider replacement tenants because one of the replacement tenants has gone bankrupt. That's not true for Burlington. It's only true for Lacey. And if there's an issue to be resolved there, it should be done on remand. But, I mean, do you dispute that as a fact? I mean, it seems to me that that's pretty readily ascertainable. I don't dispute the bankruptcy as a fact, Your Honor. The question is what inferences should be drawn from that. Well, I think the only inference they're asking us to draw is that just because they found a replacement tenant doesn't necessarily mean that the tenant is going to be in there for the remainder of the original tenant's term. That is correct, Your Honor. So do you dispute that as a matter of, I don't know, general knowledge? Your Honor, first of all, this has nothing to do with Burlington, which is the larger share of the verdict in this case. Second of all, if there's an issue with respect to the recovery of rent by Lacey, that's something that should be decided after this Court remands for a retrial on damages. The last point I'd like to make has to do with prejudgment interest. As you observe, Judge Tolman, if reasonableness or I'm sorry, Judge Watford, if reasonableness is an issue for the jury, then by definition a claim is not liquidated. To be liquidated, the dispute has to be whether it's in or out. A classic case is recovery from an insurer for a loss, whereas here the amounts of the individual amounts invested by these landlords and tenant improvements were or were not recoverable or were capital improvements or whether they were reasonable. Those were disputed. There was evidence on both sides. The jury decided in favor of the landlords, but until the jury ruled, no one could know what the judgment would be. That's a classic unliquidated claim. Thank you. Thank you very much. Thank you all for an excellent argument, and the case that's argued is submitted. We will puzzle our way through it and get you an answer as soon as we can. We are adjourned for the day.
judges: O'scannlain, Tallman, Watford